UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

**Eastern** District of Kentucky
FILED

JAN 3 1 2006

AT LONDON
LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

CIVIL ACTION NO. 05-110-GWU

LOUIS E. MC CLANAHAN, II,                                  PLAINTIFF,

VS.                        **MEMORANDUM OPINION**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,                    DEFENDANT.

### INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative

denial of his application for Disability Insurance Benefits (DIB).    The appeal is

currently before the Court on cross-motions for summary judgment.

### APPLICABLE LAW

Review of the Commissioner's decision is limited in scope to determining

whether the findings of fact made are supported by substantial evidence. Jones v.

Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir.

1991); Crouch v. Secretary of Health and Human Services, 909 F.2d 852, 855 (6th

Cir. 1990). This "substantial evidence" is "such evidence as a reasonable mind

shall accept as adequate to support a conclusion;" it is based on the record as a

whole and must take into account whatever in the record fairly detracts from its

weight. Crouch, 909 F.2d at 855.

1

MCCLANAHAN

The regulations outline a five-step analysis for evaluating disability claims. See 20 C.F.R. Section 404.1520.

The step referring to the existence of a "severe" impairment has been held to be a de minimis hurdle in the disability determination process.  Murphy v. Secretary of Health and Human Services, 801 F.2d 182, 185 (6th Cir. 1986).  An impairment can be considered not severe only if it is a "slight abnormality that minimally affects work ability regardless of age, education, and experience."  Farris v. Secretary of Health and Human Services, 773 F.2d 85, 90 (6th Cir. 1985). Essentially, the severity requirements may be used to weed out claims that are "totally groundless."  Id., n.1.

Step four refers to the ability to return to one's past relevant category of work, the plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work.  Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983).  Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had.  E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994).  One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which

2

MCCLANAHAN

appear at 20 CFR Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities. 20 CFR 404.1567(b). "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing. 20 CFR 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990). If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 CFR Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely

3

using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid. Ibid. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985). Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments. Varley v. Secretary of Health and Human Services, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The administrative law judge (ALJ) found that the plaintiff suffered from degenerative disc changes of the lumbar spine and obesity. (Tr. 19). While McClanahan was believed to be unable to perform his past relevant work, he was found capable of performing a full range of sedentary jobs. (Tr. 25). Accordingly, by virtue of the application of Medical-Vocational Guidelines Rule 201.28, the plaintiff was found to be not disabled. (Tr. 25-26).

The plaintiff originally alleged that he had been disabled since October, 2002 (Tr. 47) due to back problems (Tr. 69).

The plaintiff was brought to the Emergency Room of St. Elizabeth Medical Center in February, 2000, well over two years before the actual onset date. McClanahan, who had a history of intermittent back pain for the past month,

4

indicated that his pain and worsening during the past week. (Tr. 131). He was described as "writhing in pain." (Id.). There was tenderness, mostly in the L5 region of the back, but no sensory, reflex or motor changes. (Tr. 132). The attending physician gave the patient pain medication and prescribed bed rest for several days, and advised him to obtain a family physician, who might possibly want to order an MRI and physical therapy. (Id.). The discharge diagnosis was acute lumbar pain with radiculopathy. (Id.).

The plaintiff sought out E. Allan Grimball of Internal Medicine Associates immediately after his emergency room care. The doctor noted, on first examination, that there was tenderness at the posterior iliac crest with radiation down the leg, there was positive straight leg raising. (Tr. 186). An MRI was ordered, which showed a mass effect within the foramina to the left at L2-3 and, particularly, L4-5, on the basis of degenerated bulging discs with possible focal protrusion, especially at L4-5. (Tr. 138). The plaintiff was apparently referred to  Dr. Magdy El-Kalliny for neurosurgical followup. (Tr. 184, 185).[1]

McClanahan actually returned to Grimball only intermittently for the next two years. In September, 2000  he returned and told the doctor that El-Kalliny had diagnosed his problem as back sprain, but he had developed a recurrent episode of pain a few days before returning to his original doctor. (Tr. 184).  Grimball noted

---

[1]The neurosurgeon's one report was not submitted until subsequently.

MCCLANAHAN

spinous processes tenderness and felt that the problem was back sprain. (Id.). The plaintiff thereafter returned to the doctor only in February, 2001, complaining of increasing discomfort; he indicated that his pain was worsening and that there was occasional radiating to the left said. (Tr. 183). There was some slight discomfort with torsion of the thorax, and back strain was again diagnosed. (Tr. 183). However, this time frame of intermittent treatment was still prior to the alleged onset date.

When the patient returned to see Grimball with complaints of recurrent back pain in September, 2002, the month prior to the alleged onset date, there was said to be some slight point tenderness to paralumbar musculature. (Tr. 182). An x-ray ordered by Allan Grimball showed a loss of height at the L4-5 intervertebral disc space. (Tr. 136). A report of an MRI done for the same doctor in November showed the same findings as the February, 2000 study as well as significant foraminal and a lateral extra foraminal left L3-4 focal herniation. (Tr. 137).

During this time, the plaintiff filed for DIB. The representative processing the claim indicated that the plaintiff seemed to be in pain and stood slightly bent. (Tr. 66).[2]

In January, 2003, Dr. Phillip Tibbs provided a neurosurgical consultation for Dr. Grimball. Tibbs examined the patient and reviewed the 2002 MRI and indicated

---

[2]No mention by the ALJ was made of this agency representative's observations.

6

that the plaintiff would be a candidate for a microdiscectomy, but should try an epidural steroid block first. (Tr. 140).

The plaintiff underwent a consultative examination for the agency in early February, 2003. The examiner, Jeff Reichard, reported that the plaintiff ambulated with a normal gait, appeared comfortable in the sitting and supine positions, and displayed no evidence of sensory or reflex abnormalities in the lower extremities. (Tr. 143). The doctor noted some tenderness and diminished range of motion, along with left lower extremity weakness on flexion and extension. (Tr. 143-144). He concluded that "based on the findings of this examination, the patient appears incapable of performing any significant amount of ambulating, standing, bending, stooping, and lifting heavy objects in the workplace" (Tr. 144).

At this point, the record was reviewed by an agency medical reviewer who opined that the plaintiff could perform light level work, stand/walk at least 2 hours in an eight hour day, was limited to using the left lower extremity only occasionally, and could only occasionally stoop, kneel, crouch, crawl, or climb ramps and stairs; the plaintiff was never to climb ladders, ropes, and scaffolds and needed to avoid even moderate exposure to vibrations. (Tr. 189-196). The reviewer did not discuss Dr. Reichard's vague physical capacity statement, even indicating that there was no such statement from an examining source in the record. (Tr. 195, 198).

7

Later that year, between April 16th and the end of June, the plaintiff was provided epidural steroid injections on several occasions by Howard Wesley Lynd. (Tr. 150, 154). The doctor noted that he was to receive three injections for "severe low back pain and lower extremity discomfort" and had not done well with conservative measures or Duragesic patches. (Tr. 154, 157).

Some time around this time, another agency medical reviewer analyzed the record and completed another assessment form. The reviewer, Humilidad Anzures, agreed completely with the earlier agency reviewer's assessment, and also stated that there were no examining source statements about functional capacity (Tr. 199-204).

On a follow-up office visit to Dr. Lynd after his series of injections, the plaintiff reported that the medication change as well as the last injection had brought his pain down to the moderate level. (Tr. 166). In October, Lynd completed a residual functional capacity assessment form indicating that muscle spasm, muscle weakness, tenderness and reduced range of motion with pain were still present. (Tr. 161). Straight leg raising was positive. (Tr. 165). He believed that the plaintiff could (1) occasionally lift up to 20 pounds, (2) never or rarely engage in activities such as bending, squatting, crawling, climbing, reaching above, stooping, crouching, or kneeling, (3) should avoid exposure to moving machinery and other environmental factors, and (4) could only work a total of 2 hours per day with alterations in posture

8

MCCLANAHAN

at 20 minute intervals. (Tr. 162-163).  On that date, however, the urine drug screen done on the patient showed evidence of a metaboline of marijuana and a metabolite of Hydrocodone; since this constituted a breach of his pain management agreement, Lynd discharged him from his practice and told him that he should return to his primary care physician for further evaluation and possibly a referral to another clinic. (Tr. 164). Lynd did think that he probably would need an opiate for pain control, however, based on his history. (Id.).

In August, 2003, Dr. Grimball, who had seen the plaintiff the previous month when he was complaining of difficulty sleeping and noted anxiety (Tr. 178), composed a letter stating that the plaintiff had significant degenerative disc disease that affected daily activities and that he had only limited capability to lift, move and remain in any one position for any length of time. (Tr. 175). He noted in an assessment form that the plaintiff could only work 3 hours a day, could occasionally lift up to 20 pounds, and could never or rarely squat, crawl, climb, stoop, crouch, kneel and only occasionally rotate or flex the neck, among other limitations. (Tr. 173-174).

One of the last exhibits submitted, out of chronological order was a report from March of 2000 from Dr. El-Kalliny.  At that remote time, when the 2000 MRI did not show any evidence of disc herniation and the plaintiff reported feeling better over the last few weeks, the doctor advised him to return to work. (Tr. 208-208A).

9

MCCLANAHAN

The ALJ stated that he based his findings of residual functional capacity, in part, upon the opinions expressed by the medical reviewers. (Tr. 24). However, these medical reviewers either did not have the opportunity to see the residual functional capacity opinions of the treating sources, such as Lynd and Grimball, since they reviewed the record early in the process, and could not be used to rebut these opinions as per Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994). The ALJ also focused on Dr. El-Kalliny's statement that the plaintiff should return to work; however, this doctor only saw the plaintiff on only one occasion and that was prior to the alleged onset date, whereas the record makes it clear that the plaintiff's condition had deteriorated thereafter. The ALJ also briefly referenced the fact that Dr. Tibbs, who saw the plaintiff once during the relevant period, did not list any specific restrictions; as the plaintiff aptly notes in his brief, while Tibbs may not have specifically listed restrictions, he did indicated that the plaintiff would be a candidate for surgery, which does not expressly support the residual functional capacity suggested by the agency, either.

In short, the period around and after the alleged onset date was one for which increased symptomatology, more regular treatment and MRI changes were documented. It was also the time frame in which two treating sources (Lynd and

MCCLANAHAN

Grimball) issued residual functional capacity assessment which were not properly
rebutted.[3] The case will be remanded for further consideration.

This the _3/_ day of January, 2006.

G. WIX UNTHANK
SENIOR JUDGE

---

[3]The Court does not find the two treating sources' opinions to be so patently
deficient that it would relieve the agency of the obligation to at least secure the services
of a medical reviewer who had analyzed the entire record.